IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE, TENNESSEE


SONY/ATV MUSIC PUBLISHING LLC, *et al.*
　　　　　　　　Plaintiffs,

　　　　vs.-

　　　　　　　　　　　　　　　　Case No. 3:14-cv-1929
1729172 ONTARIO, INC., a Canadian
corporation, d/b/a "TRICERASOFT.COM," d/b/a
"SELECTKARAOKE.COM," d/b/a　　　　Judge Sharp
"KARAOKEDOWNLOADS.CA" and GAI
MARCOS, individually,　　　　　　　Magistrate Judge Griffin

　　　　　　　Defendants　　　**JURY DEMAND**

**Reply Memorandum In Support of Plaintiffs' Application for Temporary
Restraining Order and Preliminary Injunction**

## I.　　Introduction

Plaintiffs hereby submit their Reply Memorandum in support of their Motion for a

Temporary Restraining Order and Preliminary Injunction to address the arguments in the

Defendants Response to Plaintiffs' Application for Temporary Restraining Order and

Preliminary Injunction ("Response") and the Exhibits filed therewith. (Doc. Nos. 16-16.7)  As

set forth in greater detail below, Defendants are infringing the Plaintiffs' interests in the Subject

works in one or more of the following ways, to wit: copying, reproducing, manufacturing,

selling, and/or distributing unauthorized karaoke products based on Plaintiffs' copyrighted

musical compositions. The Defendants oppose the entry of a temporary restraining order and/or a

preliminary injunction on the grounds that:

　　1.) the karaoke recordings at issue were either expressly or impliedly licensed by
　　　　Plaintiffs;
　　2.) that Plaintiffs do not own/control the copyrights in the Subject Works;
　　3.) that "172902 Ontario, Inc," is not a viable defendant;

      4.) that the "Recordings of Plaintiffs' Compositions Are Not Manufactured in the U.S. or by Mr. Marcos or TriceraSoft and Have Not Been Proven to Be Infringing;"

      5.) Plaintiffs have not shown a likelihood of irreparable harm;

      6.) balancing of the equities weighs in favor of Defendants; and,

      7.) entering a Temporary Restraining Order or Preliminary Injunction would be against the public interest.

Defendants contend Plaintiffs cannot establish a likelihood of prevailing on the merits sufficient to justify the entry of a temporary restraining order or preliminary injunction.

Plaintiffs respectfully submit the Defendants' arguments are factually and legally baseless as more fully set forth herein for the following reasons:

      1.) No licensing, express or implied, has ever been issued to the Defendants to authorize their exploitation of the karaoke products at issue;

      2.) Even if the court were to find licensing exists, all of the exploitation by the Defendants would still be infringing because no license authorizes their admitted copying and selling illegal recordings made by third parties (regardless of whether such entities are foreign or domestic);

      3.) Even assuming *arguendo* the Defendants possess the karaoke licenses they claim in their papers, their exploitation during the timeframe *prior* to their having obtained such licenses (more than one year in the case of each such "license"), but during the three-year statute of limitations period, is still actionable infringement.

      4.) Again assuming *arguendo* the Defendants possess the EMI karaoke license they claim in their papers, that license was for a term of two years and was "Effective as of: October 1, 2012." Thus, the EMI license expired on September 30, 2014, over a month ago, and no renewal or extension has been requested, much less (as one might expect) agreed to in writing. Plaintiffs have both sued the Defendants and sent a Cease and Desist letter, both of which have been ignored by the Defendants.

      5.) Plaintiffs also either own title to or, in the alternative, hold a current valid assignment of the copyrights in the Subject Works for the territory of the United States and/or Canada.

      6.) Defendants fail to rebut the showing if irreparable harm.

      7.) The Defendants' "balancing of the equities" argument is predicated on misstatements of fact and citation to inapposite authorities.

      8.) The Defendants' "Public Interest" argument, in substance, lobbies for the perverse notion of an unfettered right of the Defendants to continue to infringe the Plaintiffs' copyrighted works in perpetuity and is patently frivolous.

Accordingly, Plaintiffs meet each of the criteria to obtain entry of a temporary restraining order and preliminary injunction and Plaintiffs' motion should be granted. A

2

Temporary Restraining Order and Preliminary Injunction should enter.  In support hereof, Plaintiffs have filed concurrently herewith the **DECLARATION OF ANNE KATHERINE SCHLEICHER** ("Schleicher Decl."), **DECLARATION OF AMY COLES** ("Coles Decl."); **DECLARATION OF JONAS KANT** ("Kant Decl."), **DECLARATION OF ANDREW CURTIS** ("Curtis Decl."); **DECLARATION OF JODIE COOK** ("Cook Decl.") **DECLARATION OF JAMES E. MCDUGALD**("McDugald Decl."), **DECLARATION OF TIMOTHY L. WARNOCK** ("Warnock Decl."), **DECLARATION OF MELINDA KILLEN** ("Killen Decl.") and the Exhibits attached thereto in support hereof.

## II. ARGUMENT

**Plaintiffs Meet Each of the Criteria for Entry of a TRO and Preliminary Injunction**

### PREFACE

a.  **No Sony/ATV licenses, either Express or Implied, have ever been Issued to the Defendants Authorizing their Exploitation of Plaintiffs' Copyrighted Works and the Likelihood of Plaintiffs Prevailing on the Merits is a Certainty**.

As Senior Judge Thomas Wiseman has often admonished in copyright infringement cases wherein injunctive relief is sought, the issue is a simple one: "This is a copyright infringement case.  You either have a license or you don't."  While it is also true that Judge Wiseman has warned defendants that his Court reserved the right to enter a summary judgment for liability for copyright infringement at the conclusion of a preliminary injunction hearing, Plaintiffs respectfully submit that while this Court is not bound by such procedural efficiencies, the evidence with regard to the nonexistence of any licensing authorizing the Defendants' conduct is one with respect to which there is no genuine material issue of fact.  As set forth herein and in the Declarations and Exhibits filed in support hereof, the Defendants have never possessed any

3

licensing, either express or implied, permitting them to exploit Plaintiffs' copyrighted works. Accordingly, they are liable for copyright infringement. As well, the persistent refusal of the Defendants to acknowledge their unauthorized use of Plaintiffs' copyrighted works or cease their ongoing infringement warrants the imposition of injunctive relief. Otherwise, Plaintiffs will be deprived of their unique statutory grant of exclusive rights to control the exploitation of their copyrighted works and be left with nothing more than an endless series of lawsuits for damages as additional claims for infringement accrue on a daily basis.

i.) **Defendants' Response Effectively Admits No Conceivable Licensing Existed for Defendants, Either Express or Implied, Prior to November 15, 2012 (for EMI) and Prior to December 18, 2012 (for Sony/ATV.**

Suffice it to say Plaintiffs strenuously reject the notion that any licensing, either express or implied, has ever been issued by Sony/ATV or EMI to the Defendants authorizing their copying, advertising, distributing or sale of their karaoke products. That said, even if this Court should find, contrary to all of the clear evidence that such licensing existed, the Defendants are still liable for copyright infringement by their own admissions. With regard to any EMI license, the Defendants first assert n their Response the following:

> "The EMI Plaintiffs issued an express written synchronization license (#EKA1207_0001) to TriceraSoft in configurations for physical, streaming and electronic (download), which was executed and returned to Sony, EMI's agent. TriceraSoft paid a $5,000 advance to EMI on November 15, 2012 as requested, and accounted and paid quarterly thereafter."

(Document 16, p. 4)

With regard to the assertion of a Sony/ATV license, Defendants' Response states as follows: "Sony offered and TriceraSoft accepted Sony's synch license terms in writing effective December 18, 2012 for a two-year period." (Doc. No. 16, p. 4) Once again, regardless of the

4

validity of such statements, it is indisputable that the statute of limitations for copyright infringement is the three-year period immediately preceding the filing of suit. Thus, any infringement of the Plaintiffs' copyrighted works occurring during the period from October 1, 2011 to October 1, 2014 (and thereafter) are actionable. By their own admissions regarding the terms of the two *ersatz* licenses claimed by them to exist, the Defendants lawful exploitation would only have been permitted from November 15, 2012 at the earliest (for EMI claims) and from December 18, 2012 at the earliest (for Sony/ATV claims). Thus, Defendants are liable for all infringements between October 1, 2011 and the commencement dates of their asserted licenses. Two examples of infringements taking place *prior* to any claimed karaoke licensing by the Defendants are attached to the Stacey Decl. as Exhibits "C" and "D," though the website www.tricerasoft.com lists songs with a column indicating when the songs were added to the site and there are *thousands* of Plaintiffs songs dated prior to the date of any karaoke licensing asserted by Defendants.

Therefore, based on the clear and unequivocal statements set forth in Defendants' Response, coupled with the fact that the Defendants have never denied having sold karaoke recordings utilizing the Plaintiffs' copyrighted content prior to November 15, 2012, it is an absolute certainty that the Defendants will be held liable for copyright infringement even if their patently absurd assertions of licensing are ever accepted by the Court or trier of fact. It is of no moment that the Defendants also claim that they have been paying performance royalties for many years because, as anyone remotely familiar with music licensing knows, performance licenses from the Performing Rights Societies in the United States and Canada do not authorize karaoke uses which are audio/visual works. (Schleicher Decl., ¶ 10. (f.-g.) and Exhibits ""E," "F," "G" and "H" attached thereto)

5

### ii. Defendants' Response Effectively Admits Copyright Infringement Notwithstanding *arguendo* that Defendants possessed Valid Enforceable Karaoke Licensing with Sony/ATV and EMI

The Defendants unquestionably exceeded the scope of any licensing permissions granted to them under either of the licenses they claim were issued to them. The Defendants' Response boldly ***admits*** that "**Any Recordings of Plaintiffs' compositions Are Not Manufactured in the U.S. or By Mr. Marcos or Tricersaoft….**" (Doc, No. 16, p. 9., **emphasis in original**)  This is consistent with the allegations in the Complaint: "…the initial copies of the recordings . . . have actually been made by third parties (themselves unlicensed);  thus, the gravamen of Defendants' conduct likes in their unlawful duplication, reproduction and distribution of such unauthorized recordings."  (Doc. No. 1, pp. 31-32, ¶ 31  Defendants effectively admit that they have been copying recordings made by third-parties and merely defend under the assertion that "These third parties (referenced on Plaintiffs' 16 exhibits) appear to be foreign companies …." (Document 16, p. 10)  The assertion begs the question as to what difference it would make if indeed the third-party manufacturers/suppliers were foreign companies.  Plaintiffs submit it makes no difference whatsoever.  What does make a difference is whether those third-parties were licensed to make karaoke recordings and distribute them to commercial entities such as the Defendants for further commercial exploitation.

Plaintiffs have emphatically alleged in the Verified Complaint and Amended Verified Complaint that the suppliers of the brands identified in the Exhibits are indeed "themselves unlicensed." *Id.*  Moreover, the Schleicher Declaration attests that none of the brands that are the subject of Exhibits "1" – "16" are licensed by Sony/ATV or EMI. (Schleicher Decl., ¶ 13)  The Defendants demanded proof in their Response and now they have it though, indeed, it would

6

seem to have been more appropriate for the Defendants to ascertain that their copying and distribution of recordings made by third-parties was itself lawful (which it is not) *before* they undertook the further replication and distribution of such products.

It is axiomatic that the copyright owner's grant of permission to make recordings, such as karaoke recordings, and distribute them to the public is not satisfied by the putative licensee merely copying the recordings (licensed or unlicensed) of third-parties. (*See, e.g., Fame Publishing Co. v. S&S Distributors, Inc.*, 363 F. Supp 984, at 988; *citing, Duchess Music Corporation v. Stern,* 458 F.2d 1305, (9th Cir. 1972) rehearing and request for rehearing *en bank* denied April 26, 1972, cert. denied October 11, 1972)  The *Fame* and *Duchess Music* cases deal with compulsory licenses and defendants who were copying recordings (under the purported auspices of HFA licensing) that were actually lawfully made by third-parties.   The Court disabused the defendants of the notion that they could rely on HFA licensing because anyone who seeks to rely on licensing permissions to make recordings "… must hire some musicians, take them into a studio and make his own recording." (*Id*.)

Accordingly, with greater force, any reproduction of a karaoke recording sourced from <u>unlicensed</u> producers such as those responsible for the brands identified on Exhibits "1" – "16" of the Complaint would exceed the grant of permissions to make arrangements and karaoke recordings and distribute them.  The partially executed EMI Agreement, upon which Defendants purport to rely for licensing of their karaoke products specifically defines "Karaoke Production" as meaning:

> "… the ***arrangement and recording of an individual Composition***, with and/or without the lead vocal, inclusive of the right to display lyrics of the Composition in synchronism or timed-relation with the on-screen printed lyrics of such Composition …."

> (Schleicher Decl., Exhibit "D," p. 3, ¶ 1.(b)(e), **Emphasis added**)

7

The EMI partially executed license document upon which Defendants attempt to rely provides:

> "11.    Reservation of Rights/Restrictions.  This Agreement does not authorize or permit any use of the Composition not expressly set forth herein and specifically the terms of this Agreement are limited to the use of the Composition only as originally fixed in the Production (i.e. manner, placement, use) and does not include the following rights unless otherwise expressly set forth herein: …to use a particular master recording or sound-a-like recording and/or any audiovisual master of the Composition not owned or separately licensed by Licensee…. Publisher reserves all rights not expressly granted to Licensee hereunder…."

Schleicher Decl., Exhibit "D," ¶ 11.

Having admitted using the karaoke recordings supplied by the third-party foreign entities, which brands Ms. Schleicher emphatically attests to being categorically *unlicensed*, Defendants exploitation is clearly beyond the scope of the permissions granted to them (again, *arguendo*) to make "the arrangement and recording of an individual Composition …."  The Defendants, as alleged, merely copied illegal recordings made by others to their servers;  then, they illegally made copies which they sold, again and again…to this day… as downloads or custom discs throughout the world including the United States and Canada, where they had no licensing to do such.     In this regard, it is not so much that Defendants *might* have possessed karaoke permissions from EMI or performance licenses from the PROs;  rather, as stated by the Ninth Circuit,  the question in this context is whether they exceeded the scope of any licenses they possessed:

> "The district court erred in assuming that a license to use a copyrighted work necessarily precludes infringement. A licensee infringes the owner's copyright if its use exceeds the scope of its license. *Gilliam v. American Broadcasting Cos.*, 538 F.2d 14, 20 (2d Cir.1976). **The critical question is not the existence but the scope of the license**."

> *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087 (9th Cir 1989);

8

Because the Defendants had no permission to copy and distribute recordings made by third parties, especially illegal ones, each and every recording advertised, distributed and/or sold by the Defendants is exploited beyond the scope of any licensing permissions granted and constitutes copyright infringement.

### ii. No Express Sony/ATV License Was Issued to Defendants

The relevant facts regarding the Defendants' lack of any express or implied Sony/ATV licensing are set forth in the Schleicher Declaration. Ms. Schleicher's Declaration and the Exhibits which reference the e-mailed communications and documents exchanged between the parties unequivocally demonstrates that no terms for licensing permissions were ever agreed to by the parties, no written offer was made by Sony/ATV or accepted by the Defendants, no written license document was ever generated much less executed by any of the parties, no specific songs were ever requested by the Defendants to be approved for licensing and no specific compositions were in fact ever approved by Sony/ATV for the Defendants' exploitation. Sony/ATV repeatedly admonished the Defendants that no licenses existed and no agreements were in place. Sony/ATV further admonished the Defendants not to make any royalty payments as no agreements were in place and that the Defendants needed to provide a list of all the unauthorized uses which they had made and/or were making of Sony/ATV compositions and payment made for the unauthorized uses as part of any licensing agreement that might be reached. The Defendants have effectively failed and refused to provide a list of all of the compositions which have been the subject of their unauthorized uses and thus, no reparation has been made and no licensing agreement has ever been entered into.

Specifically, Anne Kathrine ("Annie") Schleicher has been employed as a Senior Licensing Analyst at the offices of Sony/ATV Music Publishing LLC ("Sony/ATV") in Nashville from the inception of TRICERASOFT's request for karaoke licensing. (Schleicher Decl., ¶ 2) Ms. Schleicher attests to the fact that she was first approached by a licensing agent, Dara Lupowitz, on March 1, 2012, who requested a karaoke download license on behalf of her "client", 172902 ONTARIO, INC., d/b/a "tricerasoft.com" and d/b/a "karaokedownloads.ca" ("TRICERASOFT"). (*Id.*, ¶ 5, Exhibit "A" thereto) Upon receiving Ms. Lupowitz's request, Ms. Schleicher went to the "karaokedownloads.ca" content on the "tricerasoft.com" website and observed that many Sony/ATV compositions were already being offered for purchase in the form of karaoke recordings, though TRICERASOFT had never requested or received a license. (*Id.*, ¶ 8) Ms. Schleicher e-mailed Ms. Lupowitz on March 5, 2012 and asked her to provide a complete list of all Sony/ATV compositions being offered by TRICERASOFT. (*Id.*) Ms. Lupowitz did not respond.

Nine (9) months later, in December 2012, Ms. Schleicher became involved in TRICERASOFT's request for karaoke licensing from EMI. In the interim between Ms. Lupowitz's approaching Ms. Schleicher for Sony/ATV licensing in March and her contacting Ms. Schleicher for EMI licensing in December, Sony/ATV had entered into a contract with one of the parent companies of the EMI Plaintiffs to administer the EMI catalog of copyrighted compositions. (Kant Decl., ¶¶ 4-6) In December, Ms. Schleicher (already aware of the TRICERASOFT's unauthorized uses of Sony/ATV and EMI content) asked Ms. Lupowitz to provide a complete list of EMI compositions as well. (Schleicher Decl., ¶ 8) Ms. Lupowitz and TRICERASOFT have never provided the requested lists or accounted for and resolved the issue of TRICERASOFT's unauthorized use of Sony/ATV and EMI copyrighted works. (*Id.*)

10

A detailed chronology of the e-mail communications and documents transmitted between Ms. Schleicher and Ms. Lupowitz is set forth in Ms. Schleicher's Declaration and may best be summarized as follows: Ms. Schleicher repeatedly admonished Ms. Lupowitz and the Defendants that no licenses had been finalized, no payments of royalties should be made until licenses were in place and to "… hold off on sending any [royalty] statements as we don't have fully executed agreements in place." (Schleicher Decl., ¶ 10 (a-k) and Exhibits "A" – "N" attached thereto)  Ms. Schleicher repeatedly explained to Ms. Lupowitz that TRICERASOFT needed to provide her with lists of all Sony/ATV and EMI compositions which had been exploited by TRICERASOFT without authorization; once those lists were received, licensing terms could be quoted with the proviso that a "larger advance" payment would be required to account for the unauthorized uses. ((*Id.*, ¶¶ 10,a.-b., j.-k. and Exhibits "A," "B," "K," "L" and "N" attached thereto)  Ms. Lupowitz frequently made no response to Ms. Schleicher's requests. On one occasion, Lupowitz stated "Of course" she would provide the lists, but then never actually sent them. (*Id.*, ¶10 j.; ¶ 12 and Exhibits "K," "L" and "N" attached thereto)

During the late summer/early fall of 2013, Sony/ATV implemented a formal written Application process relative to licensing requests. (*Id.*, ¶ 11)  Ms. Schleicher sent the Application forms for both Sony/ATV and EMI karaoke licenses to Ms. Lupowitz on October15, 2013 and received the filled Application forms back from Ms. Lupowitz the same day. (*Id.*, ¶11.; see also Exhibit "M" to the Schleicher Decl.)  In the Application responses, TRICERASOFT disclosed that it was not making its own karaoke recordings, but was instead selling copies of recordings bearing the brands of third-party suppliers, none of whom were licensed.[1]  Ms. Schleicher also

---

[1] Ms. Schleicher searched the licensing records of Sony/ATV and EMI and found that no licensing had been issued for the brands disclosed as suppliers to TRICERASOFT in its Applications:  "Mr. Entertainer," "Music Factory," "Music Maestro," "SBI," "Sundown

noted that TRICERASOFT falsely responded to the Application inquiry regarding prior unauthorized uses. The Application specifically posed the question: "Has your company already advertised, distributed and/or sold karaoke product inside the US?" TRICERASOFT answered "No." Ms. Schleicher knew that TRICERASOFT's denial was false because she had seen both EMI and Sony/ATV content being offered for sale on the "karaokedownloads.ca" website. (*Id.*, ¶ 11 and Exhibit "M" attached thereto)

Thus, it is indisputable that no express licensing was ever entered into because no terms were offered and accepted, no license document was ever signed, no advance ever paid to Sony/ATV and no songs cleared for use pursuant to any licensing permissions. The unauthorized uses of Sony/ATV copyrighted works are now the subject of this litigation and the Defendants' assertion of an implied license between Sony/ATV and the Defendants is also conspicuously without merit.

### iii. There Are No Facts to Support a Sony/ATV Implied License with Defendants

An "implied license" is an unwritten license to use a work that the Court infers from the circumstances and from the conduct between the parties. See, *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 398-99 (6th Cir. 2007). Indeed, "[c]ourts have held that the existence of an implied license to use the copyright for a particular purpose precludes the finding of infringement" and such a "non-exclusive license ... is not ... subject to [a] writing requirement" and "may be implied from conduct." *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998) (internal quotation omitted). There is no precise formula for determining whether an

---

Karaoke," "Sunfly," "Tropical Zone" and "Zoom." (Schleicher Decl., ¶ 12) The various brands of the third-party suppliers are now the subject of the Amended Verified Complaint in this litigation and identified on Exhibits 1-16 thereto.

implied license exists; rather, the Court is to examine the "intent" of the parties from the "totality of the circumstances." *Jeffrey A. Grusenmeyer & Associates, Inc. v. Davidson, Smith & Certo Architects, Inc.*, 212 Fed. Appx. 510, 514 (6th Cir. 2007). That is, the Court should explore, based on the fact and the circumstances of the individual case, whether the evidence supports the notion that the parties, in essence, made an agreement permitting the defendant to use the work, consistent with certain understandings or terms. *Johnson*, 149 F.3d at 500-02. The key issue, again, is intent, and the key question is whether the facts and the circumstances demonstrate that "the copyright owners intended that their copyrighted works be used in the manner in which they were eventually used." *Id.* at 502. Generally, the party claiming the existence of an implied license has the burden of proving the license. See, *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2nd Cir. 1995).

For its part, TRICERASOFT argues that it made all payments required under it's asserted implied license with Sony/ATV. In fact, they never sent any advance payment, (though it would surely have been returned) and only made *ersatz* royalty payments by wire transfer to Sony/ATV. (Schleicher Decl., ¶ 10.(c.); ¶ 14, i.-vi.) If they had made all quarterly payments from December 2012 to the present, they should have made 9 total payments;  i.e, 1 advance payment and 8 quarterly payments.[2]

Moreover, TRICERASOFT ignores the fact that they were repeatedly admonished not to make such payments because no licensing existed and is simply trying to prop up the conclusory argument that their unilateral sending of two wire transfers, both of which were returned to them, as evidence of a mutual agreement permitting them to use Sony/ATV copyrighted content is, at a minimum, an egregious misstatement of fact. It clearly demonstrates a calculated intention on the part of TRICERASOFT to try to unilaterally impose some sort of implied contractual

---

[2] No royalty reports identifying specific songs and units sold have ever been provided either. (Schleicher Decl.,¶12)

relationship by stealth, rather than honestly disclose its unauthorized uses of Sony/ATV content and pay the necessary price to secure a proper, valid, binding and enforceable license going forward. The conduct of TRICERASOFT is, at best, evidence of unclean hands; at worst, it is evidence of fraud. For these reasons, no licensing permissions ever existed for TRICERASOFT to use Sony/ATV copyrighted content and their persistent unauthorized use of Sony/ATV content constitutes copyright infringement as a matter of law. Therefore, the likelihood of Plaintiffs prevailing on the merits, as a pivotal consideration for granting injunctive relief, is a virtual certainty.

b.) **No EMI licenses, either Express or Implied, have ever been Issued to the Defendants Authorizing their Exploitation of Plaintiffs' Copyrighted Works and the Likelihood of Plaintiffs Prevailing on the Merits is a Certainty**.

   i.) **No Express EMI License Exists**

The factual history that demonstrates no EMI karaoke license is slightly more complicated but only just that. As an initial matter, the licensing communications relative to TRICERASOFT's request to EMI fall into two discrete date ranges; namely, the first time frame, the pre-June 29, 2012 communications between TRICERASOFT/Ms. Lupowitz with an EMI employee by the name of Meghan Roy; the second time frame involves communications between Ms. Lupowitz/TRICERASOFT post June 29, 2012 involving the Sony/ATV Senior Licensing Analyst, Annie Schleicher. Once again, it is important for the Court to remember that effective June 29, 2012 Sony/ATV began administering the EMI catalog of copyrighted compositions which responsibilities included licensing, royalty collection and virtually all aspects of the management of the EMI works.

On December 17-18, 2012, Ms. Schleicher heard from Ms. Lupowitz for the first time since their e-mail exchanges regarding the TRICERASOFT request for a Sony/ATV karaoke

download license.  The various e-mails in December resurrected the discussions regarding the Sony/ATV license and, for the first time to Ms. Schleicher's knowledge, addressed a request for an EMI license as well. (Schleicher Decl., ¶ 9b. – d. and Exhibits "B" – "D")  Relative to the subject of EMI licensing, Ms. Lupowitz forwarded an e-mail from a former EMI employee (Meghan Roy) dated June12, 2012 with a copy of a Term Sheet which was sent by Ms. Roy to Ms. Lupowitz quoting terms for an EMI karaoke license. (Schleicher Decl., ¶ 9.c. and Exhibit "C" attached thereto)  The Term Sheet was dated June14, 2012 and expressly provided that it was "… valid for a period not to exceed ninety (90) days from June 13, 2012." (*Id*.)  To the best of Ms. Schleicher's review of the documents provided by Ms. Lupowitz and TRICERASOFT, the Term Sheet was *never returned*, much less returned signed by the Defendants and within the ninety (90)day time frame for acceptance set forth in the document.   Ms. Lupowitz then forwarded copies of e-mails between the Defendant, GAI MARCOS, and Amy Coles, an employee of Sony/ATV and Sync Licensing in the Santa Monica offices of Sony/ATV.  The e-mails covered the transmission of a license document signed by Mr. MARCOS, which apparently was dated by Mr. MARCOS by hand as "Nov. 15/2012" on the short form attached thereto. ((Schleicher Decl., ¶ 9e. and Exhibit "D" attached thereto)

While Ms. Schleicher was initially led to believe from the e-mails from Ms. Lupowitz that the EMI license document sent by Defendant MARCOS was fully executed, she could find no record of a fully executed license.  On December 18, 2012, Ms. Schleicher sent an e-mail to Ms. Lupowitz inquiring whether there was in fact a fully executed EMI license.  Ms. Lupowitz did not respond to Ms. Schleicher's inquiry and Ms. Lupowitz was not to be heard from again until April 2013 four months later.  The *ersatz* license document which had been suspiciously misdirected by Defendant MARCOS to the Santa Monica, California offices of Sony/ATV was

never accepted by EMI, never approved and never countersigned by anyone at EMI or Sony/ATV. (Schleicher Decl., ¶ 9.e. and Exhibit "D" attached thereto)  Amy Coles emphatically denies having anything to do with the negotiation, drafting or approval of the EMI partially executed license document. (Coles Decl., ¶ 4. And Exhibit "A" attached thereto.)

Thus, as of December 18, 2012, there was clearly no express or implied EMI karaoke license relative to TRICERASOFT's exploitation of EMI copyrighted content in its karaoke products, because the June 12th Term Sheet quote had never been timely accepted and the so-called "EMI license" that was sent to Sony/ATV on November 16, 2012 was never approved or countersigned by any authorized person at EMI or Sony/ATV. The partially executed EMI License form has not been approved and executed since December 18, 2012 and thus there is no express EMI karaoke license upon which Defendants may rely to argue they will prevail on the merits.

### ii.) No Implied EMI License Exists

In April 2013, Ms. Schleicher sent an e-mail to Ms. Lupowitz again addressing the fact that she only had "… a partially executed license …." (Schleicher Decl., ¶ 9f. and Exhibit "E" attached thereto)  Ms. Schleicher also requested Ms. Lupowitz to forward copies of the licensing from the various performing rights societies whom Ms. Lupowitz stated were being paid royalties for all of the TRICERASOFT recordings.  Ms. Lupowitz forwarded an e-mail with a copy of PRS for Music Karaoke Download License which had been sent to her by her client, the Defendant GAI MARCOS.  However, an examination of the License and the related "Terms and Conditions" governing that License conspicuously disclosed that the United States and Canada were not within the definition of the "Territory" to which the License pertained.  Therefore, it could not authorize the conduct of TRICERASOFT in advertising, distributing and selling

16

karaoke recordings in the United States and Canada. (Schleicher Decl., ¶ 9f.-g. and Exhibits "E," "F" and "G" attached thereto)

On April 24, 2013, Ms. Schleicher received an e-mail from Ms. Lupowitz asking for a list of writers who deny karaoke permissions for their works. Ms. Schleicher responded that Sony/ATV and EMI do not approve or deny karaoke requests except on a song by song basis and that no list existed per se. Ms. Schleicher told Ms. Lupowitz that if she had an inquiry about a specific writer to let her know which specific writer she was inquiring about. (Schleicher Decl., ¶ 9h and Exhibit ""I" attached thereto) At no time, either prior to her subsequent to Ms. Schleicher's April 25, 2013 e-mail to Ms. Lupowitz, has there ever been a specific request from either Ms. Lupowitz or anyone at TRICERASOFT inquiring about an approval and licensing for any specific song or the works of any specific writer. Accordingly, neither Sony/ATV nor EMI have approved any songs whatsoever for TRICERASOFT's karaoke exploitation in the United States or Canada. (*Id.*) Thus, there cannot be said to be any implied license with regard to any single song, much less the thousands of songs being infringed by TRICERASOFT as of April 25, 2013.

On May 7, 2013, Ms. Lupowitz sent an e-mail to Ms. Schleicher indicating she had "royalty statements for Tricerasoft" and inquired where they should be sent. (Schleicher Decl., ¶ 9i and Exhibit "J" attached thereto) Ms. Schleicher responded with two e-mails on May 10, 2013 admonishing Ms. Lupowitz that "no payment should be sent until we have an agreement in place" and to "… hold off on sending any statements as we don't have fully executed agreements in place." Ms. Schleicher also pointedly asked Ms. Lupowitz "What do the statements represent?" Ms. Lupowitz made no response. (*Id.*)

A month later, on June 11, 2013, Ms. Schleicher received an e-mail from Ms. Lupowitz inquiring whether the agreements were "signed yet" and Ms. Schleicher responded that EMI and Sony/ATV were "… waiting on getting the OK from NY before we can proceed." (*Id.*) Thus, as of June 12, 2013, Sony/ATV and EMI were clearly admonishing TRICERASOFT that no licensing was in place and that TRICERASOFT had no permissions and should not be submitting royalty reports which are documents provided for in a dully executed licensing agreement which did not exist. It is also clear that Ms. Lupowitz and TRICERASOFT were persisting, by their conduct, in effectively refusing to disclose the specific Sony/ATV and EMI copyrighted works which they were exploitation without authorization.

On July 7, 2013, Ms. Schleicher sent another e-mail to Ms. Lupowitz requesting her to send the song lists for all Sony/ATV and EMI songs which had been used without authorization. Ms. Lupowitz responded that "Of course" she would send the lists. Ms. Lupowitz then inquired whether Ms. Schleicher had forwarded a contract yet. Most significantly, Ms. Lupowitz asked that if Ms. Schleicher had not yet sent the contract would she agree to "change the start date so that [MARCOS] doesn't lose a year …." Ms. Lupowitz clearly understood that there was no license in place and that even if a license was executed at that time (i.e., July of 2013) it would only be effective for one year based upon the partially executed licensing proposal by her clients. Thus, it cannot reasonably be said that any mutually agreed to licensing arrangement existed as of July 17, 2013. (Schleicher Decl., ¶ 9j and Exhibit "K" attached thereto) Notwithstanding Ms. Lupowitz's assurance that she would "Of course" send the song lists, she never did and has not to this day. (*Id.*)

18

### b. Plaintiffs Own/Control the Subject Works in Whole or in Part

The Defendants have argued that Plaintiffs fail to show a likelihood of prevailing on the merits with regard to their ownership of some of the Subject Works. Their argument is based upon a review of records from the United States Copyright Office showing certificates of registration for a number of the Subject Works and also contains summary charts prepared by counsel addressing compositions from Plaintiffs' Exhibits the Verified Complaint. The Defendants' argument is completely without merit because they simply misunderstand the nature of the records at the Copyright Office.

As set forth in the Declarations of Jeffrey Smarr and Audrey Ashby, who collectively represent 55 years of copyright and licensing administration experience on behalf of music publishers, the registrations and certificates of registrations maintained at the Copyright Office do not reflect *current* ownership or control of the works identified therein. Rather, the registrations filed with the Copyright Office reflect the authorship and claimants to the Subject Works at the time that the registrations were filed with the Copyright Office. (Smarr Decl., ¶ 4 a.) They do <u>not</u> reflect current ownership or control of the copyrights, which are subject to change as a result of administration/assigment agreements, catalog acquisitions, exclusive licenses or other transfers of the copyright interests. *Id.* The prior recordation requirement formally embodied in Section 205(d) of the Copyright Act was repealed by the Berne Convention Implementation Act of 1988, effective October 31, 1988. Thus, it has neither been the law nor the practice to record transfers with the Copyright Office for the last 26 years.

In another misrepresentation to the Court, Defendants' response states that "Plaintiffs never bothered to ask Mr. Marcos or Tricerasoft if they had licensed any of the works." (Doc. 16, p. 7) During the course of the many e-mails exchanged between Ms. Schleicher, Ms. Lupowitz

and Defendant MARCOS, Ms. Lupowitz emphatically stated that all of the recordings being marketed by TRICERASOFT were licensed and the royalties were "… being paid to the various performance societies demanding licenses." (Schleicher Decl., Exhibit "B")  Ms. Schleicher then requested that Ms. Lupowitz and TRICERASOFT provide her with copies of the "MCPS license and any other performance societies licensed to [TRICERASOFT] in the different territories." (Schleicher Decl., Exhibit "E")  In point of fact, the Defendants never disclosed that they had any licensing from "House of Bryant" or anyone else.  To be precise, neither their response nor the Exhibits thereto *yet* demonstrate that they have a license from "House of Bryant" or anyone other than the Performing Rights Organizations referenced in their e-mails over a year ago.  With regard to the five songs identified relative to the "House of Bryant" ownership remarks in Defendants' Response, the truth of the matter is that Sony/ATV controls 100% of the rights to all five of the compositions throughout the world except the United States. (Smarr Declaration, ¶ 9, Exhibit "C" thereto)  Those rights extend to control of all five copyrights in Canada where the Defendants reside.  This Court had plenary authority to enjoin the Defendants' infringement of Plaintiffs' copyrighted works throughout the world as indeed the court has *in personam* and subject matter jurisdiction over the Defendants.[3]

For these reasons, the Defendants' arguments which focus extensively on registration information from the Copyright Office and misstatements of fact are utterly without merit.

---

[3] It may be that Plaintiffs are not entitled to <u>damages</u> under the Copyright Act for the Defendants' infringement of the five songs in question ("*All I Have to Do is Dream*," "*Raining In My Heart*," "*Love Hurts*," "*Bird Dog*" and "*Wake Up Little Susie*.")  But the Court can certainly enjoin the Defendants' infringement of those songs throughout the rest of the world where indeed the Plaintiffs do control 100% of the copyrights.  (*See e.g.,* Smarr Declaration, ¶

c. **The Misnomer of Defendant "172902 Ontario, Inc." Has Been Cured by the Filing of the –AMENDED-VERIFIED COMPLAINT FOR INJUNCTION AND DAMAGES**

The Defendants argue that the Plaintiffs' naming of Defendant "172902 Ontario, Inc." as a Defendant in this action justifies the finding that Plaintiffs have failed to demonstrate a likelihood of prevailing on the merits. Plaintiffs respectfully submit that the naming of "172902 Ontario, Inc." as a Defendant is purely a misnomer. Plaintiffs have since identified the correct name of the corporate entity as "1729172 Ontario, Inc." but would point out to the Court that the address of the corporation and Mr. MARCOS' ownership and control of the corporation are the same as set forth in the Complaint. In any event, Plaintiffs have filed a Verified Amended Complaint pursuant to the authority of FRCP 15, and have cured the typographical misnomer of the corporate Defendant. Accordingly, while not suggesting that such a misnomer logically or practically speaking would preclude the Plaintiffs from prevailing on the merits against Defendant MARCOS, the matter is now moot and Defendants' argument on this issue should be foreclosed.

d. **The Admission that "Any Recordings of Plaintiffs Compositions Are Not Manufactured in the U.S. or by Mr. Marcos or TriceraSoft" Constitutes an Admission of Copyright Infringement**

The Defendants disregard the fact that even if, as they so strenuously contend, they did not actually sell or license any custom disc recordings during the three year statute of limitation period, the mere offer to sell recordings of Plaintiffs' copyrighted works without appropriate licensing constitutes copyright infringement, as it is a violation of the copyright owners' distribution right. As noted by Professor Nimmer:

> "The distribution right accorded by Section 106(3) is to be interpreted broadly, consonant with the intention expressed by its drafters. . . . No

consummated act of actual distribution need be demonstrated in order to implicate the copyright owner's distribution right."

Nimmer § 8.11(B)(4)(d).

Moreover, Defendants' denial of distributing physical custom discs in to Tennessee is patently false.[4] The Declarations of Jodie Cook, Jim McDugald, and Andrew Curtis directly refute Defendants' claim that Defendants neither create nor ship infringing copies to Tennessee. For example, Jodie Cook used Defendants' interactive website to purchase a custom DVD disc and two custom CD+G discs. (Cook Decl. ¶¶ 5-8.) Combined, those three discs hold 49 different infringing songs. (Cook Decl. ¶¶ 7-8.) Ms. Cook received all three of these custom discs in the mail within the Middle District of Tennessee. (Cook Decl. ¶¶ 7-8.) All three discs unmistakably bear Defendants' trade names, "KaraokeDownloads. CA" and "TriceraSoft." (Cook Decl. ¶¶ 7-8, Ex. E-F.) Moreover, the packing slip, or "Dispatch Note," that arrived with each disc lists a return address for "Tricerasoft C/O Digitop." (Cook Decl. ¶¶ 7-8, Ex. E-F.) That Defendants may have these discs shipped by a third party does not insulate Defendants' infringing conduct. Likewise, Defendants have transmitted numerous infringing copies into the Middle District of Tennessee via download from Defendants' interactive website. (Curtis Decl. ¶¶ 3-9; McDugald Decl. ¶¶ 3-7.)

### e.    Plaintiffs Have Made a Strong Showing of Irreparable Harm

Defendants mischaracterize the decision in *Lexmark* in an attempt to pigeonhole the ruling to apply only to the Digital Millennium Copyright Act ("DMCA"). In *Lexmark*, the Sixth Circuit actually **extended** the presumption of irreparable harm that exists in copyright claims to claims under the DMCA:

---

[4] Not unlike Defendants' statement that they've

22

> **"In the copyright context, much rests on the first factor because irreparable harm is presumed** once a likelihood of success has been established and because an injunction likely will serve the public interest once a claimant has demonstrated a likelihood of success in this setting. **We see no reason why a similar presumption of irreparable harm should not apply to claims under the DMCA.** Like the district court before us, we accordingly focus on the likelihood that Lexmark will succeed on its claims under the general copyright statute and the DMCA."

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 532-33 (6th Cir. 2004) (internal citations omitted) (**emphasis added**). Moreover, Defendants also cite a case from this jurisdiction that holds a presumption of irreparable harm applies in copyright infringement cases. (Doc. 16) (citing *Schenck v. Orosz*, No. 3:13-CV-0294, 2013 WL 5963557, at *6 (M.D. Tenn. Nov. 7, 2013), which states "When plaintiffs show a reasonable likelihood of success on their copyright infringement claims, the plaintiffs are entitled to a rebuttable presumption of irreparable harm.").

Defendant's reliance on *Basicomputer Corp. v. Scott* is also misplaced.[5] *Basicomputer* is not a copyright case, to which courts in this district apply a rebuttable presumption of irreparable harm once a plaintiff establishes a likelihood of success. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 532-33 (6th Cir. 2004); *Schenck v. Orosz*, No. 3:13-CV-0294, 2013 WL 5963557, at *6 (M.D. Tenn. Nov. 7, 2013). In any event, the court in *Basicomputer* granted a preliminary injunction and found irreparable harm based on a loss of goodwill:

> The evidence establishes that the defendants, in possession of confidential information, have contacted their former Basic clients and, in some instances, have successfully made sales to these customers on behalf of Sears. The departure of these defendants, who once accounted for half or more of Basic's White Plain's sales, coincided with a precipitous drop in Basic's sales. Calculating the effects of such repeated attempts to diminish a former employer's goodwill is "difficult, if not impossible, to determine monetarily." *Ferrero v. Associated Materials, Inc.,* 923 F.2d 1441, 1449 (11th Cir.1991). Such a loss is indicative of irreparable injury. *Ferrero*, 923 F.2d at 1449 ("the loss of customers and

---

[5] Defendant miss-cites *Basicomputer* as a Sixth Circuit case. Defendant's citation is actually to an opinion from the Northern District of Ohio. The Sixth Circuit affirmed that opinion, in part.

goodwill is an 'irreparable' injury.") (*citing Spiegel v. City of Houston,* 636 F.2d 997 (5th Cir.1981). *see also Economou v. Physicians Weight Loss Centers of America,* 756 F.Supp. 1024 (N.D.Ohio 1991). To this end, this court finds compelling the reasoning contained in a similar case:

Basicomputer Corp. v. Scott, 791 F. Supp. 1280, 1293 (N.D. Ohio 1991) *aff'd*, 973 F.2d 507 (6th Cir. 1992). Plaintiffs, Sony/ATV and EMI, have clearly demonstrated the catastrophic infringement of their catalogs by Defendants, effectively depriving them of their statutorily endowed *exclusive* rights to the works. They have also alleged a loss of goodwill and it cannot be seriously disputed that a prospective purchaser would be disinclined to pay billions of dollars for either the Sony/ATV or Emi catalogs if there were a public record of a massive infringer who was allowed to exploit the same works by willfully infringing unabated by injunctive relief. The only way to restore Plaintiffs to their exclusive rights is by the grant of a temporary restraining order and injunction against the Defendants further infringing conduct.


**f.      Balancing the Equities Favors the Entry of a Temporary Restraining Order and Preliminary Injunction; No Public Interest Exists to Mitigate Against the Justification for Injunctive Relief**

Defendants' reliance on *Graceway Pharmaceuticals, LLC v. Perrigo Company*, 697 F. Supp. 2d 600, (D.N.J. 2010), is unpersuasive. In *Graceway*, defendant Nycomed notified Graceway in January 2007 that Nycomed had filed a patent application to produce a generic version of Graceway's patented medical cream, on which Graceway's exclusivity expired February 25, 2010. *Id.* at 603. Graceway's medical cream was its "core product." *Id.* at 602. Graceway provided Nycomed no notice that Graceway had already submitted a patent application that Nycomed's proposed product would infringe. *Id.* at 603. Nycomed spent considerable resources continuing to pursue its patent and developed an advertising and

marketing campaign. *See id.* Moreover, the TRO Gateway sought would prevent Nycomed from exploiting the 180 day monopoly Nycomed would otherwise enjoy as the first generic on the market. *Id.* at 607. A close reading of *Graceway* demonstrates that the plaintiff timed its request for injunctive relief to coincide with defendant's entry to the market, which would challenge plaintiff's "core product." *See id.* at 602-603 (noting the sequence of the delay, that the medical cream was Graceway's "core product," Nycomed's 180 day monopoly, and that Graceway sought relief regarding lost sales of its core product even though that product was not infringed).

Here, unlike in *Graceway*, Plaintiff's notified Defendants that they were selling infringing works within a mere **four (4) days** of Defendants' first karaoke license request, which prompted Ms. Schleicher to visit their website where she saw for the first time the unauthorized uses of Sony/ATV works. (Schleicher Decl., ¶¶ 4, 6-8, 10. (a.-k.), 11-12 and Exhibits referenced therein and attached thereto) Plaintiffs *repeatedly* gave them a chance to rectify past unauthorized uses and secure licensing going forward over a period of negotiations that spanned 17 months. *Id.* Defendants now seek to have the Court punish the Plaintiffs because they made every effort to try and resolve the unauthorized uses and forward permissions in a single license transaction instead of making the dispute a Federal Court case sooner. Defendants, however, ignored those messages and continued to infringe Plaintiffs' rights. Moreover, Defendants did not spend valuable resources to develop a market and mechanism specifically for exploiting the subject works at issue, as did Nycomed with its patent. They lulled the Plaintiffs, deceived, manipulated and lied to them, tried to foist a few unsolicited payments on them surreptitiously to lay some foundation for an implied license when none existed, have evaded service of process,[6] persisted in infringing even after suit was filed and the had notice of the claims and now come before the Court and lard their opposition papers with more false statements. Any "investment"

---

[6] See Killen Decl. and the Exhibits attached thereto. See also, Warnock Decl. and Exhibits thereto.

Defendants made to copy the illegal recordings of third parties was negligible and made years ago ( the "CDG Ripper" software for stealing existing CDG recordings), in relation to the Plaintiffs' learning of the infringing conduct of Defendants.

The decisional authorities are clear that laches is presumptively not a defense to any copyright infringement claim brought within three years of the time the Plaintiff learned of the infringement. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962 (US 2014)  Plaintiffs in this case did not delay to the Defendants' prejudice.  The Defendants were already massively infringing the Plaintiffs' catalogs and all Plaintiffs did between the time of learning of Defendants' infringement and bringing suit was to immediately notify the Defendants of their infringement and meaningfully undertake a course of negotiations to try to resolve all the unauthorized uses while providing for forward looking licensing for the Defendants.  Such conduct is laudable not unreasonable. *Roof v. Conway*, 133 F.2d 819, at 827 (6th Cir. 1943); *Davis v. A. Booth & Co*., 131 F. 31 at 36 (6th Cir. 1904) Moreover, should Defendants' infringement continue unabated, there would inevitably be a multiplicity of suits to redress the ever expanding infringements which occur on a daily basis.

Defendants have no limited window to exploit the subject works without competition; they should have no window to exploit infringing works. Defendants' entire situation in the face of the request for injunctive relief is a design of their own making;  they had multiple chances to make reparation for their past unauthorized uses and in an inescapable spirit of hubris, could not bring themselves to take a righteous path to account for their infringements and legitimize their business going forward.  Defendants therefore can make no credible argument that Plaintiffs targeted any delay to harm or prejudice Defendants. *See Harsco Corp. v. Piontek*, No. CIV. 3:07-0633, 2008 WL 686217, at *11 (M.D. Tenn. Mar. 5, 2008) (disregarding defendant's delay

26

argument because "the court cannot find, as [defendant] urges, that the plaintiff purposely and unduly delayed and timed its injunction request for maximum impact upon [defendant's] entry into the serrated grating market").

There is no rational argument to suggest a public interest exists in allowing massive willful copyright infringement to continue unabated on the facts of this case. Defendants' argument lobbies the court to effectively rewrite the Copyright Act to provide for a "compulsory karaoke license;" that would be for Congress to do. The actions of the Defendants display a heinous example of arrogance, deceitfulness, willful infringement and an almost pathological denial of responsibility for their actions. The incalculable damage that would result to Plaintiffs, by effectively turning over their catalogs to the Defendants against their will, would effectively repeal the Copyright Act and all of the laudable principles and policies underlying the establishment and preservation of the rights of the copyright owners and the remedies afforded by the Act to vindicate those rights. The only inequitable practices that have been engaged in in the course of these events have been designed and implemented by the Defendants.

## IV. <u>Conclusion</u>

Plaintiffs request that the Court enjoin the TRICERASOFT Defendants from manufacturing, distributing, releasing, or otherwise exploiting any recordings based on compositions owned or administered by Plaintiffs, including the Subject Works. Plaintiffs have clearly shown a substantial likelihood of success on the merits, a likelihood of irreparable injury, a balance of the equities in their favor, and that the public is better served by prohibiting intentional infringement of recognized rights. Accordingly, Plaintiffs respectfully request that the Court grant their application for a temporary restraining order, and set an early date for a hearing on Plaintiffs' Motion for Preliminary Injunction.

Respectfully Submitted,



Paul Harrison Stacey
Law Offices of Paul Harrison Stacey, P.C.
Wyoming Bar No. 5-2615
7225 N. Spring Gulch Road
P.O. Box 4157
Jackson, WY 83001
Ph:    307-733-7333
Fax:   307-733-7360


Timothy L. Warnock (BPR #12844)
Timothy Harvey (BPR# 21509)
Riley, Warnock & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203
Ph.:  615-320-3700

**Attorneys for Plaintiffs,**
***SONY/ATV MUSIC PUBLISHING LLC, et al.***